CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAR 02 2007
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| ESTATE OF WENDELL HESTER )<br>STEPHEN P. BISHOP, EXECUTOR )<br>　　　　Plaintiff, )<br>)<br>v. )<br>)<br>THE UNITED STATES OF AMERICA )<br>　　　　Defendant. )<br>) | Civil Action No.: 5:06-cv-00041<br><br>**MEMORANDUM OPINION**<br><br>By: Samuel G. Wilson<br>United States District Judge |

Plaintiff, the Estate of Wendell Hester ("estate"), brings this tax refund suit against the United States pursuant to 26 U.S.C. § 7422, seeking to recover approximately $2.8 million in federal estate taxes and interest. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(a). The estate filed a claim for refund in January 2003 maintaining that it erroneously overvalued the "gross estate" on its January 2000 tax return by including millions of dollars in assets Wendell Hester improperly transferred to himself from a trust fund established by his wife. The estate insisted that it should not have included the misappropriated assets in valuing his gross estate because the estate had no legal or equitable right to them. The estate sought to exclude the value of the assets from the gross estate or alternatively to claim them as a deduction – despite the facts that the misappropriated, commingled assets remained in his estate; no beneficiary had asserted or was expected to assert a claim; and the statute of limitations had already run on potential claims. Believing that the estate has been properly taxed, the United States moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the court has considered matters outside the pleadings, including the estate's admissions during oral argument and its submissions to the Internal Revenue Service (IRS), the

court treats the motion to dismiss as a motion for summary judgment,[1] and concludes that the estate has failed to demonstrate a genuine issue of material fact for trial. Essentially, the estate seeks either to exclude several million dollars in commingled assets over which Wendell personally exercised dominion and control or alternatively to deduct those amounts for a hypothetical third-party claim that the trust beneficiaries never asserted and that the estate never paid or expected to pay. However, the court finds that the IRS properly determined that the commingled assets were properly included in Wendell's gross estate and that his estate is not entitled to a deduction for a hypothetical, unasserted, and unpaid claim that it never expects to be made or paid. Accordingly, the court finds that the estate is not entitled to a refund.

I.

Wendell and Dorothy Hester lived as husband and wife until Dorothy's death on November 11, 1993. Dorothy had established the Dorothy Hester Trust U/W ("the trust"), which contained substantial assets and provided that Wendell would receive a qualifying income interest for life upon Dorothy's death. Wendell was serving as the trustee when, on February 25, 1998, he breached his fiduciary duties by transferring all of its assets (the "trust assets") to himself.[2] On that date, Wendell transferred all of the trust's cash into his individual brokerage account at Schwab ("Schwab Account") which already contained his own cash and securities

---

[1] Rule 12(b)(6) provides that a motion to dismiss may be treated as one for summary judgment and disposed of as provided in Rule 56 if matters outside the pleadings are considered by the court and all parties are given a reasonable opportunity to present material relevant to such a motion. Fed. R. Civ. P. 12(b)(6). See Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985) ("When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment.).

[2] The trust included approximately $3.2 million in cash and a promissory note ("note") in the face amount of $1.25 million.

2

worth over $4 million. Wendell then engaged in several months of "day trading" of stocks and other securities, which generated over $2 million in net losses, used commingled assets to borrow on the margin, withdrew over $450,000 in cash, and collected approximately $280,000 of principal and interest from a promissory note held by the estate. In the estate's own words: "At some indeterminable point after the trust terminations and before Hester's death, the commingling became so complex that it was impossible for anyone to determine which interests in the combined whole belonged to Hester and which interests in the combined whole belonged to his children." See Attachment to Form 843 - Claim for Refund and Request for Abatement, Estate Tax Refund Claim Legal Analysis, at 4. All the while, the trust beneficiaries received nothing. Wendell died a resident of the Commonwealth of Virginia on October 12, 1998, leaving all of his assets to the Wendell Hester Trust.

Pursuant to Virginia Code §64.1-179, the executor of Wendell's estate instituted the "Debt and Demands" procedure requiring "those who may have claims against the estate to show cause against the payment and delivery of the estate assets to The Wendell Hester Trust as legatee." Newspaper notice was published, as required by law. After no one appeared in opposition to the plan of distribution, "an Order of Distribution was entered in the Circuit Court of Frederick County, Virginia on September 20, 1999." See Supplement to Statement of Facts to Form 843 - Claim for Refund and Request for Abatement, at 1.

On January 7, 2000, the executor of Wendell's estate filed a federal estate tax return with the IRS. The return included the value of all assets on hand – including any remaining misappropriated assets – in the value of the gross estate, sought no deduction for the hypothetical claims of the trust's beneficiaries, and showed tax liability of over $2.5 million, which the estate

3

then paid. On August 27, 2002, the executor paid nearly $227,000 in additional estate taxes that were assessed after an audit and approximately $62,000 in interest. In 2003 and 2004, the estate filed claims for refunds. Reversing course from its initial return, the estate sought to exclude the value of assets appropriated from Dorothy's trust or alternatively to deduct those amounts, ultimately claiming a refund of more than $2.8 million in estate taxes and interest. On April 13, 2006, the IRS notified the estate that it was disallowing the claims, and the estate brought this refund suit.

To justify the claimed refund, the estate advances a number of claims which essentially collapse into two alternative theories. First, the estate contends that it erroneously included the misappropriated trust assets in the gross estate and, therefore, inflated the taxable estate. Under this theory, the estate claims that the misappropriated assets should be excluded from the gross estate calculation because Wendell possessed no interest in the assets after his breach of fiduciary duty but merely held the assets in a constructive trust for the trust beneficiaries. Second, the estate claims that if the property is properly included in the gross estate, the estate should be awarded an offsetting deduction of equal value, for "claims against the estate," pursuant to 26 U.S.C. § 2053(a)(3), or for "indebtedness" in respect of property that is included in "the value of the gross estate," pursuant to 26 U.S.C. § 2053(a)(4).[3]

---

[3] The estate divides these two theories into seven different claims, with Counts I-IV supporting the "exclusion theory" and Counts V and VI supporting the "deduction theory." Count VII summarily concludes that regardless of which theory the court accepts, the United States should refund estate taxes and interest paid by the estate, with interest.

Under the exclusion theory, the estate argues in Counts I and III that assets related to Wendell's breach of fiduciary duty – specifically, in Count I, the Schwab Account and note, and in Count III, certain assets traceable to the Schwab Account and note ("traceable assets") –

4

The estate does not allege that any of the trust beneficiaries have ever asserted a claim against it or Wendell, or that it has ever expected such a claim. Nevertheless, the estate argues that Wendell's gross estate and any deductions must be determined and valued as of the date of his death, irrespective of later events. In contrast, the United States contends that all commingled assets were properly included in Wendell's gross estate and that his estate may not deduct hypothetical, unasserted claims that it does not expect to pay – claims, which in any event, are barred by the statute of limitations.

## II.

The estate claims that the misappropriated trust assets should not be included in the gross estate calculation, arguing that Wendell had no interest in these assets – even though he clearly treated them as his own – because the trust beneficiaries equitably owned the assets after Wendell breached his fiduciary duty. However, "[t]axation is not so much concerned with the refinements of title as it is with the actual command over the property taxed." Burnet v. Wells,

---

should not be included in the gross estate because Wendell possessed no legal or equitable interest in these assets. In Counts II and IV, the estate alternatively claims that the same assets – the Schwab Account and note in Count II, and the traceable assets in Count IV – were properly included in the gross estate but erroneously overvalued. The estate argues that if these assets are included in the gross estate, they should be valued at $0 because the beneficiaries of the trust are the proper owners.

In support of the deduction theory, the estate claims in Count V that the misappropriated assets may be deducted from the gross estate under § 2053(a)(4) as "indebtedness." In Count VI, the estate alternately suggests that the misappropriated assets qualify as deductible "claims against the estate," pursuant to § 2053(a)(3).

Finally, in Count VIII, the estate also objects to a recent gift tax deficiency asserted by the United State against it and claims a separate estate tax deduction "[t]o the extent that all or any portion of the . . . gift tax deficiency . . . is correct."

5

289 U.S. 670, 678 (1933). As courts have recognized, a taxpayer who misappropriates funds has received income:

> When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

James v. United States, 366 U.S. 213, 219 (1961) (quoting N. Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932)).

Here, Wendell exercised dominion and control over the assets as though they were his own without an express or implied recognition of an obligation to repay and without restriction as to their disposition, commingling the misappropriated assets with his own to the extent that "it was impossible for anyone to determine which interest in the combined whole belonged to [Wendell] and which interest in the combined whole belonged to his children." Consequently, because the "gross estate" includes, at fair market value, "all property, real or personal, tangible or intangible, wherever situated" in which the decedent has an "interest" at the time of his death, 26 U.S.C. §§ 2031(a), 2033, 26 C.F.R. § 20.2031-1(b), and Wendell controlled the misappropriated assets and did not reimburse them before his death, they were properly included in the valuation of his gross estate at fair market value.[4]

---

[4] The estate claims in Counts II and IV that the misappropriated assets should be included in the gross estate but valued at $0. See supra note 3. However, the estate freely admits that the assets' fair market value is substantially more than $0. Essentially, the estate is merely reiterating its theory that the trust assets should be excluded from the gross estate calculation. However, for the reasons already given, these assets are properly included in the valuation of the gross estate at their fair market value.

6

## III.

The estate alternatively contends that if the misappropriated assets are included in the valuation of the gross estate, the estate should be allowed an offsetting deduction of equal value pursuant to § 2053(a)(3) for "claims against the estate," or pursuant to § 2053(a)(4) for "indebtedness" in respect of property that is included in "the value of the gross estate."[5] The facts do not support a deduction under either section. First, nothing remotely suggests that the trust's beneficiaries ever made a *claim* against Wendell or his estate or that Wendell or his estate ever expected such a claim to be made or paid, a requirement of § 2053(a)(3). Second, Wendell's personal acquisition of funds in violation of his fiduciary duty did not create an *indebtedness* under § 2053(a)(4).

Federal courts must assume that Congress intends for words to be given their "well-known meaning[s]" in the absence of clear evidence to the contrary." Deputy v. du Pont, 308 U.S. 488, 498 (1940). A "claim" is a demand. See In re Baltimore Pearl Hominy Co., 5 F.2d 553, 555 (4th Cir. 1925) (equating the terms). "The word 'claim' when used as a noun, has been defined as the 'assertion of an existing right: any right to payment.'" Metric/Kvaerner

---

[5] Section 2053(a) provides:
For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts –
    (1) for funeral expenses,
    (2) for administration expenses,
    (3) for claims against the estate, and
    (4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate,
as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

7

Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 199 (4th Cir. 2005) (quoting Black's Law Dictionary 264 (8th ed. 2004)). However, in the present case the estate does not contend that the trust beneficiaries ever asserted any right against Wendell or his estate or that the estate ever anticipated a claim to be made.[6] To accept the estate's arguments here, where there is no actual or expected claimant, for all intents and purposes, would be to replace the statutory language, "claims against the estate" with "theoretical liabilities of the estate."[7] Accordingly, the court concludes that the estate is not entitled to a deduction under § 2053(a)(3) because there has never been an actual or expected claim against Wendell or the estate.

Even though the fact that there is no actual or expected claimant is sufficient to disallow the deduction, the United States also argues that the estate should be denied a deduction because, even if there were an actual or expected claimant, the claimant would not have a cognizable claim, since any third-party claim arising from Wendell's misappropriation of the trust assets is now barred by Virginia's two-year statute of limitations that applies to breaches of fiduciary duty. The estate has not contended that the statute of limitations has not run on its theoretical

---

[6] Indeed, in a "Supplement to Statement of Facts" submitted in connection with the estate's Form 843 refund claim filed in January 2003, the estate represented that the beneficiaries of the trust "had not indicated that they would assert their constructive trust rights against assets titled in the name of Wendell Hester, Wendell Hester's estate or Wendell Hester's trust, nor have they or any one of them since indicated that they would assert such constructive trust rights." Furthermore, at oral argument, the estate admitted that it had no basis for anticipating that any claims would be filed or that a tolling provision applied to extend the statute of limitations.

[7] Such a construction would also be at odds with Treasury Regulations that elaborate on the § 2053(a)(3) allowance of deductions for "claims against the estate." These regulations provide that the amounts that may be deducted are those that "represent personal obligations of the decedent existing at the time of his death, whether or not then matured," 26 C.F.R. § 20.2053-4, and note that a deduction will be allowed even "though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and *will be paid.*" 26 C.F.R. § 20.2053-1(b)(3) (emphasis added).

8

liabilities.[8] Instead, relying on Ithaca Trust Co. v. United States, 279 U.S. 151 (1929), it argues that the running of the statute of limitations is immaterial because deductions for claims against the estate are valued on the date of death, and the statue of limitations had not run on the date of Wendell's death. The court agrees with the United States, that even if there had been a claimant, the running of the statue limitations on that claim is an event the IRS can take into account in determining the deductibility of the claimant's claim.

In Ithaca Trust Co., the Court ruled that post-death events must not be considered in valuing the amount of estate tax deductions, since "[t]he estate so far as may be is settled as of the testator's death." Id. at 155. Ithaca Trust involved valuation of a life estate and corresponding charitable deduction. The decedent had bequeathed property to charity but had reserved a life estate in his spouse. Id. at 154. Even though the widow died only six months after her husband, the court ruled that the widow's life tenancy value should be based on an actuarial computation rather than on the actual, known date of her early death. Id. at 155.

This court recognizes that the decisions following Ithaca Trust are often hard to reconcile. See, e.g., Estate of Smith v. Comm'r, 198 F.3d 515, 522 n.16 (5th Cir. 1999) ("[A]ll of the cases

---

[8] Even though the United States argues the two-year statue of limitations applicable to breaches of fiduciary duty controls, see Va. Code Ann. § 8.01-248, and the estate has not argued that it does not, the court concludes that the five-year statute of limitations for conversion is applicable. See Va. Code Ann. § 8.01-243(B) ("Every action for injury to property . . . shall be brought within five years after the cause of action accrues.); Bader v. Central Fidelity Bank, 427 S.E.2d 184, 186-87 (Va. 1993) (applying the five-year statute of limitations to a conversion claim). The five-year statute ran in February 2003. The statute of limitations for any equitable remedies also ran on this date. See Belcher v. Kirkwood, 388 S.E.2d 729, 731 (Va. 1989) ("It is a well-established principle uniformly acted upon by courts of equity, that in respect to the statute of limitations equity follows the law; and if a *legal demand* be asserted in equity which at law is barred by statute, it is equally barred in equity.") (citations omitted). The fact that the statute ran later than the United States argues does not appear material to the United States' argument.

9

in this field dealing with post-death evidence are not easily reconciled with one another, and at times it is like picking one's way through a minefield in seeking to find a completely consistent course of decision.") (citations omitted). Some courts strictly apply Ithaca Trust's directive to value deductions on the date of one's death, based on the "more or less certain prophecies of the future," Ithaca Trust, 279 U.S. at 155,[9] while other courts consider post-death events in their estate valuations, reasoning that "[t]he claims which Congress intended to be deducted were actual claims, not theoretical ones." Jacobs v. Comm'r, 34 F.2d 233, 235 (8th Cir. 1929).[10]

Despite the divergence of opinion in this area, courts often consider post-death events in

---

[9] See, e.g., O'Neal v. United States, 258 F.3d 1265, 1272 (11th Cir. 2001) ( "We prefer to follow the analysis used by the Supreme Court in Ithaca Trust"); Estate of McMorris v. Comm'r, 243 F.3d 1254, 1261-62 (10th Cir. 2001) (reasoning that excluding consideration of post-death events in the valuation of the estate "provides a bright line rule which alleviates the uncertainty and delay in estate administration which may result if events occurring months or even years after a decedent's death could be considered in valuing a claim against the estate"), Estate of Smith v. Comm'r, 198 F.3d 515 (5th Cir. 1999) (reversing a tax court decision that limited a deduction to the amount actually paid to settle a claim), Estate of Van Horne v. Comm'r, 720 F.2d 1114 (9th Cir. 1983) (allowing deduction for $596,387 actuarial value of spousal support obligation for ex-husband's lifetime, even though he died after receiving only $35,000), Popstra v. United States, 680 F.2d 1248 (9th Cir. 1982) (holding valid the date-of-death valuation of a deduction for lien claims, even though the amount actually paid by the estate in settlement of the claims was less than the amount of the deduction).

[10] See also Estate of Sachs v. Comm'r, 856 F.2d 1158, 1162 (8th Cir. 1988) ("The date-of-death valuation principle adopted in Ithaca Trust [for charitable bequests] is not universally applicable to other tax contexts."), Comm'r v. Estate of Shively, 276 F.2d 372, 375 (2d Cir. 1960) (holding that decedent's estate could not deduct full date-of-death value of spousal support obligations because ex-wife re-married before estate filed return, noting that, "To permit an estate such a deduction under these circumstances would be to prefer fiction to reality and would defeat the clear purpose of [the precursor to § 2053(a)(3)]"), Comm'r v. State Street Trust Co., 128 F.2d 618 (1st Cir. 1942), Estate of Kyle v. Comm'r, 94 T.C. 829 (1990) (disallowing the estate's deduction for the value of a date-of-death litigation claim because the case was resolved in estate's favor six years after decedent's death).

determining deductibility of theoretical liabilities. For example, in Estate of Hagmann v. Commissioner, 60 T.C. 465 (1975), aff'd per curium, 492 F.2d 796 (5th Cir. 1974), the tax court considered post-death events and disallowed a deduction for claims against the estate that became unenforceable after death. There, the Hagmann estate deducted certain debts owed by the decedent; however, the creditor ultimately failed to file a claim within the time required under Florida probate law. Id. at 468-69. Accordingly, since no claim was timely filed, the court determined that the potential obligation never became enforceable and that the debts were not deductible. Id. at 469. As other courts have noted, Estate of Hagmann essentially rejects any "deduction for a potential claim without an existing claimant -or, . . . an identifiable claimant without a cognizable claim." See, e.g., Estate of Smith v. Comm'r, 198 F.3d 515, 525 (5th Cir. 1999). Even some courts that have adopted a strict interpretation of Ithaca Trust's date-of-death valuation have adopted the Estate of Hagmann distinction and consider post-death events when a case involves hypothetical liabilities. See, e.g., Estate of O'Neal v. United States, 258 F.3d 1265, 1272 n.24 (11th Cir. 2001) ("We agree with [the Estate of Hagmann,] distinction."); Estate of Smith v. Comm'r, 198 F.3d at 525 n.41 (noting the same).[11]

Allowing a deduction here, where a taxpayer is attempting to secure a refund for a theoretical liability that will never be paid and that is now barred by the statute of limitations, would essentially "exalt form over substance." Estate of Hagmann, 60 T.C. at 468. Therefore, because the estate has neither an actual or expected claimant, or a cognizable claim, the

---

[11] The Department of the Treasury has also adopted this view. See Rev. Rul. 60-247, 1960-2 C.B. 272, 273 ("[I]t is the position of the Internal Revenue Service that no deduction will be allowed for claims against the estate which have not been paid or will not be paid because the creditor waives payment, fails to file his claim within the time limit . . . or otherwise fails to enforce payment.").

11

misappropriated assets are not deductible under § 2053(a)(3).

## IV.

The estate is also barred from taking a deduction under § 2053(a)(4) for "indebtedness" in respect of property that is included in the gross estate. Just as the court cannot construe the word "claim" in § 2053(a)(3) to be synonymous with "theoretical liability," it cannot construe "indebtedness" in § 2053(a)(4) to be synonymous either. The estate is not indebted to the trust's beneficiaries. Generally speaking, "a debt is defined for federal tax purposes as an unconditional and legally enforceable obligation for the payment of money." See Comm'r v. McKay Prods. Corp., 178 F.2d 639, 644 (3d Cir. 1949) (internal citations omitted). The estate was theoretically or hypothetically liable, but it was not "indebted" because neither Wendell nor the estate had an unconditional and legally enforceable obligation for the payment of money. Therefore, Wendell's personal acquisition of funds in violation of his fiduciary duty did not create an indebtedness under § 2053(a)(4), and the IRS properly disallowed his claim for a refund based on a deduction under that section. Moreover, a deduction under § 2053(a)(4) stands on the same untenable footing as a deduction under § 2053(a)(3), essentially for the same reasons that a deduction under that section is untenable. See, e.g., Estate of Theis v. Comm'r, 81 T.C. 741, 748-49 (1983), aff'd, 770 F.2d 981, 984 (11th Cir. 1985) (explaining that Congress enacted § 2053(a)(4) simply as a clarification of existing law under § 2053(a)(3) and meant for the sections to be applied consistently). Without a claimant pursuing it, it is purely hypothetical and theoretical, and even if a claimant pursued it, the statute of limitations would bar it.

12

## IV.

For reasons stated, the court grants summary judgment for the United States.[12] An appropriate order will be entered this day.

**ENTER:** This March 2, 2007.

_____
UNITED STATES DISTRICT JUDGE

---

[12] The court grants summary judgment as to all claims, including Count VII, except for Count VIII, which it dismisses as moot.

Count VII is merely cumulative of Counts I-VI, as the estate simply restates its overarching conclusion that the United States should refund estate taxes and interest to it. Because the court found that the estate presented no genuine issue as to any material fact in Counts I-VI, the court also finds no genuine issue as to any material fact in Count VII.

Finally, in Count VIII, the estate argues that it may be entitled to a deduction for a gift tax deficiency that the United States asserted on April 13, 2006, depending on whether the assessment is correct. The United States has conceded that the assessment is defensive in nature so that it will not pursue the deficiency if the estate's other claims are denied. Therefore, the court dismisses Count VIII as moot.

13